UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BELINDA FOUNTAIN,

                Plaintiff,

        vs                             99-CV-389

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, and GLENN S.
GOORD,

                Defendants.

U. S. DISTRICT COURT
N. D. OF N. Y.
FILED

JUN 2 3 2005

AT _____ O'CLOCK _____ M
LAWRENCE K. BAERMAN, Clerk
UTICA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:

HINMAN STRAUB P.C.
Attorneys for Plaintiff
121 State Street
Albany, New York  12207

ELIOT SPITZER
Attorney General of the State of New York
Attorney for Defendants
Office of the Attorney General
The Capitol
Albany, New York  12224

OF COUNSEL:

EDWARD J. GREENE, JR., ESQ.

BRUCE J. BOIVIN, ESQ.

DAVID N. HURD
United States District Judge

## MEMORANDUM DECISION and ORDER

## I. INTRODUCTION

      Belinda Fountain ("Fountain" or "plaintiff") brought suit against New York State

Department of Correctional Services ("DOCS") and Glenn S. Goord ("Goord") in his capacity

as Commissioner of DOCS, (collectively, "defendants").  Plaintiff claims the defendants' sick

leave policy violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12112(d)(4)(a).

Both sides previously filed for summary judgment and those motions were decided

in Fountain v. New York State Dep't of Corr. Servs., 190 F. Supp. 2d 335 (N.D.N.Y 2002).

The decision was appealed and the Second Circuit affirmed in part, and vacated and

remanded in part in Conroy v. New York State Dep't of Corr. Servs., 333 F.3d 88 (2d Cir.

2003).  Following further discovery and pursuant to Fed. R. Civ. P. 56., defendants moved

again for summary judgment.  Plaintiff cross-moved for the same.  Oral argument was heard

on April 22, 2005, in Albany, New York.  Decision was reserved.

## II. FACTS

DOCS is an agency of the State of New York that maintains 71 correctional

facilities throughout the state in which over 69,000 inmates are confined.  DOCS employs a

workforce of over 30,000 correction officers.  Plaintiff is a corrections officer and works the

midnight shift as a dorm officer at a minimum security prison operated by DOCS.  She also

suffers from asthma and severe pulmonary obstructive disease.

At the previous summary judgment phase of this litigation, plaintiff alleged that

DOCS's sick leave policy violated the ADA prohibition against employer inquiries into

disabilities.  The policy requires employees returning to work after an absence to provide a

doctor's statement which includes a "brief diagnosis" of the employee's illness.  The relevant

portion of DOCS's policy is related in DOCS Directive No. 2202 - Attendance Control

Program (the "Directive") (Docket No. 79, Bloomingdale Aff. Ex. C).  Inter alia, defendants

argued that the diagnosis disclosure requirement fell within the business necessity exception

of the ADA provision and was therefore permissible.  Defendants argued that the policy

served necessary business purposes; it addressed the problem of employees' abuse of sick

time, it ensured that its corrections officers were physically able to perform their jobs and it

helped prevent the spread of infectious diseases.  Plaintiff's summary judgment motion was granted and the defendants' denied.  Fountain, 190 F. Supp 2d at 340.  The Second Circuit found that questions of fact remained as to the business necessity exception and remanded for further discovery and/or trial. Conroy, 333 F. 3d at 102.

The policy under consideration in the previous decisions has since been changed. That policy did not include a minimum number of days of absence after which a doctor's certification and general diagnosis would be required.  This fact was particularly noted in granting plaintiff's summary judgment motion.

> [T]he sick leave policy provides no limitation on the ability of the defendants to ask for medical diagnosis.  Employees may take an unplanned single day leave of absence for a myriad of reasons, the vast majority of which do not suggest an inability to do their job or a threat to their work environment.  Examples of such reasons include the common cold or care of a sick child.  Therefore, no reasonable factfinder could conclude that an inquiry triggered by a single day's absence from work is the type of reasonable expectation discussed above.

Fountain, 190 F. Supp.2d at 340.

The current policy is briefly stated in a DOCS Memorandum issued to all employees reminding them of the requirement on March 1, 2005.

> In accordance with Directive #2202 - "Attendance Control Program", for all absences greater than three days (four days for CSEA), all employees will be required to provide medical documentation that shall include the following:
>
> 1) A statement that the employee was unable to work.
> 2) Specific dates the employee was unable to work.
> 3) Prognosis - The date upon which the employee can return to work or a statement that the employee must remain out of work until his/her next appointment date (specific date).
> 4) A brief diagnosis for employee's illness (not required for illness in the employees family).

(Docket No. 91, Engelbright Aff. Ex. A)(emphasis added.)  See also Docket No. 79,

Bloomingdale Aff. Ex. C.

The change in the policy has not altered plaintiff's position, and as in the previous

summary judgment motion, plaintiff still seeks declaratory relief that the general diagnosis

requirement violates the ADA and an injunction prohibiting DOCS from requiring her to

submit one.  Defendants continue to argue that the business necessity exception applies.

After it found that questions of fact as to the business necessity exception precluded

summary judgment, the Second Circuit offered guidance to both the district court and the

parties as to how to proceed on remand.

> Up to this point, both parties have made only conclusory assertions
> regarding the benefits or lack thereof of the diagnosis requirement.
> Therefore, on remand, the district court should permit further discovery. It
> may be helpful to depose both expert and lay witnesses to testify on
> issues such as the essential functions of corrections officers and the
> ability of physicians to understand those functions and to assess whether
> the corrections officer can safely return to work. Factual development on
> the efficacy of general diagnoses (as opposed to certification without
> diagnoses) in improving workplace health and security and in curbing sick
> leave abuse is particularly necessary.

Conroy, 333 F.3d at 99.  Accordingly, the parties have provided such information.

Beginning with the issue of the essential functions of corrections officers, DOCS

provided documents describing the class of employees known as correction officers.  (Docket

No. 79, Bloomingdale Aff., Ex F. Classification Standard:  Occ. Code 8700100 - Correction

Officer.) The distinguishing characteristics of the position are related as follows:

> On assigned posts, Correction Officers are responsible for the security of
> the facility, inmate conduct and discipline, and for the enforcement of the
> rules and regulations governing the operation of the facility and the
> confinement, safety and general well-being of inmates.  The direct
> responsibility of the maintenance of security and order within the facility
> combined with periodic anti-social behavior of some inmates presents a

- 4 -

potential for immediate physical harm to a uniformed officer either in the form of a direct assault or in quelling of disruptive behavior or disturbances among inmates. In emergency situations, such as attempted or actual escapes, disruption of facility operations or riotous behavior, a Correction Officer may be required to use firearms, chemical agents and other safety and emergency equipment.

Id.

Joseph Scott, a corrections officer and assistant grievance director within DOCS, testified that the actual job duties vary significantly across the 30,000 DOCS correction officers and estimated that less than 18,000 officers face the daily risks suggested by DOCS. (Docket No. 91, Scott Aff. ¶12.) The actual duties of officers vary significantly in the amount of inmate contact required and in the type of contact - from direct supervision to security at gates. The risks also vary between maximum and minimum security facilities.

To demonstrate that corrections officers may at any moment be involved in an incident requiring the use of force, defendants provide statistics gathered from its Unusual Incidents reporting system. Unusual incidents are defined as serious occurrences that may impact upon or disrupt facility operations or that have the potential for affecting DOCS's public image or that might arouse widespread public interest. (Docket No. 79 Vann Aff. Ex. H DOCS Directive 4004, Unusual Incident Report.) The number of reported incidents in which staff used force were tallied by year.

> Calendar Year 2000 - 855 Incidents
> Calendar Year 2001 - 868 Incidents
> Calendar Year 2002 - 827 Incidents
> Calendar Year 2003 - 767 Incidents
> 1/1/04 - 11/15/04     - 665 Incidents

(Vann Aff. Ex. I.) These numbers reportedly do not include numerous incidents where force was used to break up fights between inmates. (Vann Aff. ¶ 20.)

- 5 -

James Bloomingdale, the Assistant Director of Personnel for DOCS, provided deposition testimony regarding how particular medical conditions may effect the safety of the facility.

> An officer who is short of breath may be unable to assist a fellow officer in subduing an assaultive inmate. The medically compromised officer and/or the other officer could be hurt or killed, as could any other person in the area. Many officers carry keys. A medically or mentally compromised officer could be overwhelmed by inmates(s) and have her keys taken. This potentially puts the entire facility at risk. Officers transporting inmates outside correctional facilities, such as to hospitals or court appearances, are armed. The inability to properly perform her duty due to a medical or mental condition increases the risk that the inmate may escape and possibly obtain the firearm. This would put the officers and public at risk.

(Bloomingdale Aff. ¶ 35.) Bloomingdale explained that the diagnosis disclosure requirement will reveal disabilities that DOCS believes it should be aware of that employees would not otherwise choose to reveal.

> Some illnesses or conditions are obvious even to casual observers, such as injuries that require the use of crutches or a sling. But many are not so obvious, such as knee braces that are covered by trousers. Hidden disabilities, such as heart disease, diabetes, seizure conditions and some mental illness, may have devastating effects on the individual and those around her. An officer suffering a heart attack or a diabetic having a severe hypoglycemic reaction or an epileptic having a seizure are not only unable to do their jobs, but they require others to react to their distress. Such emergencies in a correctional facility draw other officers and personnel from their posts, and inmates can take advantage of such situations.

(Bloomingdale Aff. ¶40.)

The general diagnosis is used to determine whether or not the employee should be referred to work directly or sent to DOCS's Employee Health Service ("EMS") to determine if the employee is fit for duty. This determination is made according to the best judgment of staff in the personnel department after a facility brings the employee's absence to their

attention.  Only a small fraction of the medical documentation that is provided at facilities

ever comes to the attention of the DOCS personnel office, and only a fraction of those

require a referral to EHS. (Docket No. 93, Lindsay Reply Aff. ¶¶ 6-8.)  "Employees returning

to work after a bout of flu, even if absent for several weeks, are not referred to EHS because

there is no reason to believe the person cannot fully perform the essential functions of the

job." Id. at  ¶ 22.

> Furthermore, employees
>
> who have been out of work for a relatively short period of time (a week or
> two) are usually allowed to return to work on the day of their return, even
> without the medical certification on hand that day as long as they are not
> on Step III or exhibiting an observable disability or known to have taken
> sick leave for a potentially debilitating condition.  We recognize that these
> employees do not have the medical certification the first day returning to
> work because they forgot about the requirement of simply forgot the note.
> To require a medical certification from these few employees on the day
> the report to work prior to allowing them back on the job, would result in
> an unacceptable amount of overtime to cover for those who do not have
> the notes.

(Bloomingdale Aff. ¶20.)

In order to demonstrate that DOCS is not able to rely solely on a doctor's

certification, DOCS provided statistics on the employees who are referred to EHS after their

doctor has returned them to duty.  DOCS asserts that there is a significant error rate in the

doctor's certification.  The error is attributed to the fact that employees may not fully explain

their job duties to their physician.  The statistics show the period of the employees absence,

the general diagnosis and whether or not EHS subsequently found the employees fit for duty.

Mary Beth Lindsay, Assistant Director of Personnel for DOCS, reviewed the records of

employees who were referred to EHS from 2000 through July 2004.  (Docket No. 79,

Lindsay Aff. ¶ 7 - 20.)[1]  Lindsay found that 159 employees were referred to EHS after their doctor's certified them fit for duty and EHS subsequently found 58 of them unfit.

Of the total 159 employees sent to EHS for evaluation only 47 had been absent for two months or less.  Of those 47, 10 (or 20.2%) were found to be unfit to return to duty. (Docket No. 91, Green Aff. ¶ 24.)  Only 4 of the 159 referrals were made after less than a 4-day  absence.  Two of those four were found unfit for duty.  Id. at ¶ 25

Linda Klopf, Communicable and Infectious Disease Supervisor for DOCS, provided testimony as to the importance of managing the spread of communicable diseases with facilities. (Docket No. 79, Kloph Aff.)  Klopf explained DOCS's tuberculosis (TB) control policy and program.  All employees are required to participate in the DOCS TB screening program. She noted that other infectious and communicable diseases that may be introduced into the facilities by employees returning from sick leave.  "It is impossible to measure how many employees returned to work with a diagnosis of a communicable disease which were addressed on a local level.  A regional infection control nurse may have been consulted and many employees may have gone home to fully recover." (Lindsay Reply Aff. ¶ 20.)  At the time of deposition, she could only recall one employee identified with a communicable disease through the attendance control procedures, a case of chicken pox.

---

[1] Defendants' Reply brief includes a follow up study conducted by Lindsay covering from July 2004 through February 2005.  Docket No. 93, Lindsay Reply Aff. ¶¶13 - 19.  Plaintiff objects to the admission of this new data which was submitted without plaintiff's opportunity to question Lindsay at deposition.  The information does not change the instant ruling even when considered, but it is noted here.  There were 101 EHS referrals during this relative brief time.  Out of the 101, 18 (or 17.8%) of the employees were subsequently found unfit by EHS.  Eighteen were for absences of two months or less and five (or 27.7%) were found unfit by EHS.  Three were for absences less than six  days or less and two (or 66%)  were found to be unfit.  Apparently 1 of the 101 referrals related to a drug resistant respiratory infection.  Id. at ¶ 20.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is granted only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Silver v. City Univ., 947 F.2d 1021, 1022 (2d Cir. 1991). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). Thus, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997). The Court is "to

- 9 -

grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." Schwimmer v. Kaladjian, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing Anderson, 477 U.S. at 249-50).

### B. Business Necessity Exception

The ADA provides that a "covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability." 42 U.S.C. § 12112(d)(4)(A). Here, as the Second Circuit confirmed, the general diagnosis requirement of the DOCS Directive is an "inquiry" under that ADA provision. Conroy, 333 F.3d at 95. Thus, the requirement violates the ADA "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The issue for determination in the pending motions is therefore a narrow one, whether defendant has demonstrated that its general diagnosis disclosure requirement after a three-day absence is a business necessity for purposes of 42 U.S.C. § 12112(d)(4)(A).

Defendants offer two justifications for their policy.[2] First, the diagnosis allows DOCS to ensure that employees can safely and securely perform the functions of a corrections officer. Second, it provides DOCS with information needed to guard against the severe disruption that would result from infectious diseases spreading through the staff or inmate population.

"With respect to each justification, the [employer] must show (1) that the claimed purpose is in fact a business necessity, (2) that the policy genuinely contributes to it, and (3)

---

[2] Defendants no longer argue that a diagnosis disclosure is necessary to curbing employee abuse of sick leave.

is reasonably defined." Transp. Workers Union, Local 100 v. N.Y. City Transit Auth., 341 F.

Supp. 2d 432, 446-47 (S.D.N.Y. 2004).

### 1. Business Necessity

To prove that its policy serves a business necessity the employer must first show

that the asserted "business necessity" is vital to the business. Conroy, 333 F.3d at 97-98.

"An employer cannot simply demonstrate that an inquiry is convenient or beneficial to its

business." Id. Neither one of the business purposes asserted by DOCS are disputed.

DOCS is responsible for maintaining security and order in its facilities for the

protection of both its inmates and staff. This must be accomplished through a fit staff of

corrections officers. Staff and other inmates are vulnerable to periodic anti-social behavior of

some inmates in the form of a direct assaults and attempts at escape. Correction officers

may also be required to use firearms, chemical agents and other safety and emergency

equipment in cases of emergency. DOCS has demonstrated that many of the duties of a

correction officer require the mental and physical ability to respond at the moment to protect

the safety of others.

Furthermore, DOCS must maintain the overall health of persons within its 71

facilities. It is not disputed that limiting the spread of communicable diseases in a staff of

30,000 and inmate population of 69,000 is a valid business necessity under these

circumstances. See Conroy, 333 F.3d at 98. Large scale staff absences disrupt prison

operations and large scale illness among inmates strains the medical staff and disrupts

inmate programs and work details.

### 2. "Genuinely Serves" the Business Necessity

The Second Circuit emphasized that an "examination of whether a policy actually contributes to the business necessity is vital." Conroy, 333 F.3d. at 100.

> The employer must also show that the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary. The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal.

Id. Furthermore, "the business necessity standard is quite high, and is not [to be] confused with mere expediency." Id. at 97 (citing Cripe v. City of San Jose, 261 F.3d 877, 890 (9th Cir. 2001)). "If DOCS can show that, due in part to its unique staffing requirements, it has a reasonable basis for concluding that such employees as a group pose a genuine health or security risk, and that the general diagnosis requirement allows DOCS to decrease that risk effectively, it can satisfy the business necessity exception." Id. at 101.

### a. Fitness to perform duties

Defendants assert that its sick leave policy serves its business purposes by identifying officers who are not fit to safely perform their duties despite certification by their doctor.   DOCS argues that employees absent from work for more than three consecutive days trigger the need for a diagnosis because experience and common sense has shown that an absence of that length is most likely due to a serious illness or condition.  DOCS finds doctor's notes indicating an officer is fit for duty are insufficient because the doctors are often unable to appreciate the exact requirements of the corrections officer's position.

The issue here is not whether DOCS is ever justified in requiring a general diagnosis after a return from sick leave.  Even the plaintiff rather generally concedes that the

requirement may be justified after a two-month absence.  The specific question here is the timing of the requirement.  DOCS must demonstrate that the information it claims it requires must be gathered at the time it has chosen in order to serve its purpose - after three days of absence.

First, the common sense portion of defendants' argument is belied by DOCS practice and testimony.  Common sense dictates that a large portion of sick leave is taken due to the common flu about which Lindsay stated:  "Employees returning to work after a bout of flu, even if absent for several weeks, are not referred to EHS because there is no reason to believe the person cannot fully perform the essential functions of the job." (Docket No. 93 Lindsay Reply Aff.  ¶ 22.)  Defendants did not provide statistics to show what percentage of sick leave of any particular duration is due to any particular type of diagnosis.  But it did note that employees returning from such absences are not strictly required to immediately provide their medical documentation for administrative reasons.  Common sense would dictate that if such employees were an unreasonable safety risk, the risk would be greatest immediately upon their return.  Regardless, the acknowledgment that two-week absences are not significant in and of themselves conflicts with defendants' assertion that three-day absences likely denote serious conditions

Second, DOCS complains of doctor error in deeming employees fit for duty.  The statistics provided do not effectively demonstrate error that would justify an inquiry into all corrections officers after each three-day absence.  First of all, no reasonable error rate can be derived from a measure of 159 employee sick leave applications which were later referred to EHS.  Some account must be taken of the hundreds and likely thousands of medical documentations which DOCS receives and relies on regularly.

DOCS has shown that of out 40,000 employees, tracked over four years, two employees identified by their medical documentation after less than a one-week absence were found unfit after a doctor certified them.  Demonstrating that DOCS considers some doctor's certifications erroneous, whether made after three days or many months, is not sufficient to show that the error rate is high enough to justify any particular timing requirement.[3]  The defendant has not demonstrated that the three-day mark is related to gathering the information it needs.

### b. Containment of communicable diseases

The second justification DOCS offers for requiring the diagnosis disclosure is that DOCS must guard against the spread of infectious disease within correctional facilities. Defendants argue again that common sense shows that a three-day absence is most likely due to a serious condition and it is essential that an employee return to work free from an illness which would infect others.  It argues further that many of the common communicable diseases such as mumps measles and the flu will result in absences of more than three days thus requiring a diagnosis for such absences is likely to catch most of the absences due to the communicable conditions.

DOCS's offer of evidence in support of this assertion is two-fold.  One part of its effort consists of providing information on the risks involved in tuberculosis (TB) outbreaks and the DOCS' specific TB control policy.  The program is a comprehensive and effective but unrelated to the issue here.  If the diagnosis inquiry was considered necessary for preventing

---

[3] These statistics, and those related to longer absences, do show that EHS staff does disagree with some doctor's certification but do not reveal whether the EHS determinations are upheld when and if challenged.

the spread of TB it would likely be part of the comprehensive program as opposed to part of an attendance control program.  Furthermore, an employee's diagnosis of TB would be made known to DOCS without the disclosure policy.  The medical provider who makes the diagnosis is required to notify the State Department of Health which would in turn notify DOCS. (Docket No. 91, Greene Aff, Ex. C, p 45).

Defendant's other effort to support this argument consists of pointing to its policy need to prevent the spread of other communicable diseases, like mumps, measles, the flu, chicken pox or meningitis.  This argument is fatally undermined by its admission that it allows employees to return to work who have forgotten to bring their doctor's certification.  In allowing a return to work without a diagnosis DOCS has engaged in legitimate balancing process.  It weighed its safety risks with its administrative burdens and costs.  DOCS has determined that the risk of spreading communicable diseases is outweighed by financial considerations such as overtime costs.  Considering that balancing process, the disease risks are not so grave that they will be compromised by the enforcement of the ADA's privacy protections.

Most importantly, DOCS has the burden to demonstrate that its policy actually effects its purpose.  Defendants' witness, Ms. Klopf, a sixteen year employee, could only recall one case where chicken pox was discovered through the attendance control policy.  Defendants claim that this fact is not persuasive as it does not adequately measure all reports.  Indeed, defendants have provided testimony to the effect that only a small fraction of the medical certifications that are provided at facilities ever come to the attention of the DOCS personnel office and only a fraction of those require a referral to EHS.  (Lindsay Reply Aff. ¶¶ 6-8.)  It was explained that "[i]t is impossible to measure how many employees

- 15 -

returned to work with a diagnosis of a communicable disease which were addressed on a local level.  A regional infection control nurse may have been consulted and many employees may have gone home to fully recover." (Lindsay Reply Aff. ¶ 20.)  In fact, the record does not contain any information, one way or the other, as to the nature and effect of the bulk of sick leave documentation. Thus, it is not possible to conclude anything in particular about how the three-day policy serves the business necessity to contain communicable diseases.

Defendants have not demonstrated that requiring a general diagnosis upon return from a three-day absence has had or will have any effect on the spread of communicable diseases in it facilities.

### 3. Class of Employees

While a court must always engage in a careful analysis as to whether an ADA inquiry falls within the business exception there is an added dimension when the inquiry is part of a policy applied to a group of employees.  In Conroy, the court emphasized the need to examine the way in which the employer defined the class of employees to which the requirement is applied.  "In defining a class subject to a general policy, the employer must show that it has reasons consistent with business necessity for defining the class in the way that it has.  The court should grant some deference to the employer in determining how to define a class subject to a general policy."  Conroy, 333 F.3d at 101.

It has been determined that the DOCS policy does not meet the business necessity exception.  Therefore it is not necessary to rule on the manner in which DOCS defined the class of employees required to provide medical documentation in order to maintain the safety of inmates and staff in their facilities.  However, as the policy must be redrafted, it is simply

- 16 -

efficient to comment on the over breadth of DOCS's class definition as that relates to time periods requiring medical documentation.

Despite the fact that the DOCS Directive refers to <u>all</u> employees, DOCS has attempted to define the class subject to the inquiry as applied only to security officers. Defendants acknowledge that as the policy is written it applies to all employees but insist that the instant case concerns only security officers because plaintiff is a security officer. (Docket No. 93 Def. Reply Brief p. 9, Fn 1.)  The policy must be interpreted as written and this attempt at amendment by briefing is rejected.  Regardless, the proffered definition does not constitute a narrowly tailored class of employees.

In <u>Transportation Workers Union, Local 100 v. N.Y. City Transit Auth.</u>, 341 F. Supp. 2d 432 (S.D.N.Y. 2004), the court was called upon to apply the <u>Conroy</u> analysis to a general diagnosis inquiry similar to the one at bar.  The Transit Authority required employees to disclose a diagnosis after absences of two or three days depending on union participation of the employee.  The employer asserted two justifications for its inquiry as it applied to two different types of employees.

The Transit Authority required all employees to self-diagnose on their sick leave forms in order to curb sick leave abuse.  Such a universal sweep was considered unjustified as too broad.  <u>Id</u>. at 449.  The policy could only be applied to the narrowly drawn class of employees that the Transit Authority already suspected as sick leave abusers and had already placed on a Control List.

The Transit Authority asserted that bus operators were a proper class for the application of a doctor's diagnosis requirement to serve the purpose of maintaining the safety of its customers and the public at large.  The court agreed it could be applied "to *any* bus

- 17 -

driver for *any* amount of sick leave because if a driver is sick behind the wheel on even a single occasion, he may cause enormous damage." Id. at 451 (emphasis in original). The court found that bus drivers were a narrowly drawn class in a safety-sensitive role and limited its ruling only to that group. The court specifically declined to decide whether safety considerations would justify the application of the policy to other Transit Authority employee groups. Id. at 451.

DOCS's 30,000 corrections officers are engaged in a multitude of tasks which involve a broad range of physical and mental requirements in the context of different types of safety and security risks. It is not reasonable to lump them all together. The diagnosis inquiry is only justified by DOCS's need for employee fitness as required according to the particular duties that an employee must perform. It is recognized that categorizing each employee by specific tasks for purposes of requiring medical documentation after absences of different lengths presents an administrative burden. However, the current policy lumping all corrections officers together cannot be logically related to the need for a general diagnosis. It is presumed that it is possible, and likely already done in practice, to narrow the job titles of correction officers to better reflect the risks and fitness requirements involved with particular positions without overburdening DOCS. The class as defined does not reflect any effort to narrowly draw a class.

The court in Conroy discussed the importance of narrowing the class of employees subjected to an inquiry requirement in the context of curbing sick leave abuse. "[I]f the policy ultimately affects a class of so-called attendance abusers that is much larger than that small group of employees with truly egregious attendance records . . . DOCS will find it more difficult to prove business necessity." Conroy, 333 F.3d at 102 (quotations omitted).

- 18 -

Logically, if DOCS narrows the proffered class, or divides it into several classes, it is more likely to be able to justify a diagnosis requirement for a particularly safety-sensitive group after a short absence. However, if DOCS insists on defining the class as its entire staff of 30,000 corrections officers then it must set a significantly longer absence to justify the requirement of medical documentation which includes a general diagnosis.

Plaintiff admits that the duration of an employee's absence is a factor in determining when a diagnosis requirement is proper, the longer the absence, the more likely the employee may be unfit. Plaintiff notes that the statistics are more persuasive at the two-month mark. However, neither party has requested, nor would it be appropriate to judicially set an absence time period between three days and two months. The time period or periods must be justified by the defendants or by agreement of the parties.

### IV. CONCLUSION

Defendants have not demonstrated that the three-day absence general diagnosis inquiry requirement serves a business necessity through either of its stated justifications; ensuring officers can perform their duties or to prevent the spread of infectious disease. Thus, as the inquiry does not fall within the exception, and it is an inquiry which violates the ADA, plaintiff's cross-motion for summary judgment must be granted.

Therefore, it is

ORDERED that

(1) Defendants', New York State Department of Correctional Services and Glenn S. Goord's, motion for summary judgment is DENIED;

(2) Plaintiff Belinda Fountain's cross-motion for summary judgment is GRANTED;

- 19 -

(3) The defendants are permanently enjoined from implementing their sick leave policy in so far as such implementation is inconsistent with this opinion.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated:   June 23, 2005
         Utica, New York.